## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Alena Fassbender,**

**Plaintiff,**

**v.**                                          **Case No. 15-cv-9373-JWL**

**Correct Care Solutions, LLC,**

**Defendant.**

## <u>MEMORANDUM & ORDER</u>

Plaintiff Alena Fassbender filed this lawsuit against her former employer asserting claims of pregnancy discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  This matter is presently before the court on defendant's motion for summary judgment on all claims (doc. 49).  As explained below, the motion is granted.

## I.      Facts

The following facts are uncontroverted, stipulated in the pretrial order, or related in the light most favorable to plaintiff as the nonmoving party.  Defendant Correct Care Solutions, LLC ("CCS") contracts with governmental entities throughout the country to provide comprehensive healthcare services to incarcerated individuals.  CCS employs approximately 11,000 people, who serve mostly in medical and administrative roles in jails, prisons and residential treatment facilities.  The facility involved in this case is the Wyandotte County Detention Center located in Kansas City, Kansas.  The detention center houses male and female

adult offenders who are awaiting trial or sentencing or who have been sentenced to serve their time at the detention center.

Plaintiff Alena Fassbender was employed by CCS and worked at the detention center in Kansas City, Kansas.  Plaintiff was hired in November 2014 as a Certified Medication Aide ("CMA") on an "as needed" basis.  As a CMA, plaintiff was responsible for distributing medications to inmate-patients at the detention center.  At the time plaintiff was hired, she acknowledged in writing that she had read and received defendant's Fraternization Policy. Generally speaking, that policy precludes undue familiarity between CCS employees and inmate-patients.  Pertinent to this case, the policy expressly precludes employees from engaging in personal conversations with inmate-patients and precludes an employee from taking out of the facility any correspondence from an inmate-patient.

On March 22, 2015, Kay Thompson offered plaintiff a full-time CMA position and plaintiff accepted the position.  At all times relevant to the lawsuit, plaintiff was supervised by Ms. Thompson.  Plaintiff was pregnant at the time she accepted the full-time position.  Ms. Thompson was not aware of plaintiff's pregnancy at the time she offered plaintiff the full-time position.  Two other CCS employees working at the detention center were also pregnant at that time.[1]  Shortly thereafter, in early April, Ms. Thompson entered the break room while plaintiff was discussing her pregnancy with other employees.  According to plaintiff, Ms. Thompson "had not known until that point" that plaintiff was pregnant and Ms. Thompson said to her, "What, you're pregnant too?"  A few days later, plaintiff heard another employee mention to

---

[1] These two other employees, both of whom were supervised by Ms. Thompson, have since returned from maternity leave and remain employed by defendant.

Ms. Thompson that yet another employee was trying to become pregnant. According to plaintiff, Ms. Thompson said "Are you kidding me? Who is it? I don't know how I'm going to be able to handle all of these people being pregnant at once." In addition, one of plaintiff's coworkers, Lori Lentz-Theis, avers that she overheard a conversation between Ms. Thompson and an administrative assistant during which the assistant (who was also pregnant and discussing the need to take time off for pregnancy-related medical appointments) asked Ms. Thompson "what she was going to do when [plaintiff] needed to go to doctors' appointments because of her pregnancy." According to Ms. Lentz-Theis, Ms. Thompson responded, "I have too many pregnant workers, I don't know what I am going to do with all of them." Ms. Lentz-Theis avers that Ms. Thompson sounded "very angry and frustrated compared to how she usually sounds."

On April 30, 2015, plaintiff was passing medications out to inmate-patients in the detention center around 10:15am when an inmate-patient approached plaintiff, carrying a handwritten note under his arm. The inmate-patient dropped the note on plaintiff's medication cart. Plaintiff pushed the note to the side of her cart, under a notebook. According to plaintiff, she pushed the note aside because she was "very busy" at the time. After she finished passing medications to inmate-patients, plaintiff placed the note on a shelf in the medication room with other papers. Her shift ended at 3:30pm. Plaintiff was in contact with approximately six detention center officials that day but she did not turn the note into any of those officials or her supervisor and she did not read the note before she left work. Rather, at the conclusion of her shift, plaintiff placed the note in her personal bag and took the note home with her. The note, which plaintiff read at home, stated as follows:

What up sexy lady how was your night at work good I hope not tireing [sic] cause you had 3 days off and I wasn't able to see your beautiful face, shit I thought you quit on us but I knew you wouldn't let that happen.  Anyway you know I have told you in many ways that I like you, sometime's [sic] I just get caught up on what to say cause I don't want us to get in trouble so I just kept it on small talk so it would be cool if we were good friends.  I know you have a beautiful son and one on the way (Girl) but most of all you have a great sense of humor and a nice personality you are down to earth, sweet, honest that's why I like you.  I know you said we could be friends but what kind of friend just hi see you later or what if you are serious about this let me know and How old are you?  I'm 31.  If you write back write as (LaLa) that is your nick name from me to you!

Plaintiff testified that she started "freaking out" when she read the note because the note was "sexually suggestive" and indicated the inmate's desire to have a relationship with plaintiff.  She further testified that she did not know how the inmate knew about her son; that she never told the inmate that they could be friends; that the inmate had never called her "LaLa" before; and that she had never used the nickname "LaLa."

Although plaintiff was not scheduled to work the following day, she went to the detention center sometime after 3:30pm and turned the note into officials at the detention center.[2]  She told various detention center officials that the note was "extremely inappropriate" and made her feel uncomfortable.  She also told staff members that although the note suggested that she and the inmate had a personal relationship, no such relationship existed.  According to plaintiff, the officials at the detention center told her "not to worry about the situation" and that they would contact Ms. Thompson.  That same day, Friday, May 1, 2015, Lieutenant Tracy McCullough, an official at the detention center, telephoned Ms. Thompson to advise her that one of Ms. Thompson's employees had accepted a note from an inmate, taken the note out of the facility, and then had returned to the facility more than 24 hours later to speak to detention center staff

---

[2] To be clear, the officials at the detention center are not employed by CCS.

about the note.   During that conversation, Lt. McCullough expressed her displeasure that plaintiff had removed a note from the facility and had circumvented Ms. Thompson and come directly to detention center staff during non-working hours.[3]   Ms. Thompson then called her supervisor, Lynn Philpott, who was CCS's regional vice president.  Ms. Philpott instructed Ms. Thompson to call CCS's human resources department.   Ms. Thompson testified that Ms. Philpott also instructed Ms. Thompson that CCS "needed to do whatever it took" for its client, Wyandotte County Detention Center, to feel comfortable with the situation.[4]   At that point, Ms. Thompson contacted Pat Rice in CCS's human resources department.  Ms. Rice instructed Ms. Thompson to conduct an investigation and to obtain a statement from plaintiff regarding the incident.

That night, Ms. Thompson called plaintiff and had a brief conversation with her.  Plaintiff testified that Ms. Thompson yelled at plaintiff for turning the note into the detention center staff instead of contacting Ms. Thompson first.  Plaintiff apologized to Ms. Thompson and explained that she thought the note should be taken to the center's staff because the staff is typically responsible for punishing the inmates.

On Saturday, May 2, 2015, plaintiff arrived at work for her regular shift.   At that time, Ms. Thompson issued plaintiff a final written warning and indicated that the investigation into her conduct was ongoing.  Ms. Thompson advised plaintiff that she "had not followed the chain

---

[3] Plaintiff contends that Lt. McCullough's statement is inadmissible hearsay.  This objection is overruled as the evidence is admissible under Federal Rule of Evidence 803(3).

[4] Plaintiff objects to Ms. Philpott's statement as inadmissible hearsay.  That objection is overruled.  *United States v. Shepherd*, 739 F.2d 510, 514 (10th Cir. 1984) ("An order or instruction is, by its nature, neither true nor false and thus cannot be offered for its truth.  The orders or instructions were offered to show that they occurred rather than to prove the truth of something asserted.").

of command" and had taken the note to the facility staff rather than taking the note directly to Ms. Thompson.  The final written warning indicates that the discipline was based on plaintiff's failure to report a serious issue to her immediate supervisor and her failure to "follow proper policy and procedure as outlined in the employee handbook and instructed at orientation." During this exchange, Ms. Thompson also referenced the personal nature of the information contained in the note.

Meanwhile, Lieutenant Colonel Jeffrey Fewell, the Administrator of the detention center, had been informed on May 1, 2015 that a CCS employee had removed a note given to her by an inmate.  Over the weekend, Lt. Col. Fewell had a telephone conversation with Ms. Thompson about the incident.  He advised Ms. Thompson that he was "very unhappy" that a member of her staff had violated CCS's and the center's non-fraternization policies by removing from the detention center something given to her by an inmate.  He also expressed his concern that the note contained personal information regarding plaintiff which the inmate should not have known (that plaintiff was pregnant and had another young child at home) and indicated that any conversations between plaintiff and the inmate that included such personal information would violate both entities' non-fraternization policies.  Lt. Col. Fewell told Ms. Thompson that plaintiff's decision to remove the note from the facility, as well as the contents of the note, "raised red flags" for him and that plaintiff's conduct "needed to be taken very seriously."  He advised Ms. Thompson that it was his duty to protect the inmates and staff at the detention center and that he was "not willing" to take any risk on plaintiff.  Finally, he cautioned Ms. Thompson that if anything improper happened in the future between plaintiff and the inmate, both he and Ms. Thompson "would likely both be heavily scrutinized and blamed for not taking

aggressive enough measures" with respect to the incident.  Lt. Col. Fewell and Ms. Thompson had a similar conversation on Monday, May 4, 2015.  It is undisputed, however, that Lt. Col. Fewell did not tell Ms. Thompson to terminate plaintiff's employment.

On Monday, May 4, 2015, plaintiff gave a written statement to Ms. Thompson regarding the incident.  Ms. Thompson then suspended plaintiff pending the continued investigation into the incident.  That same day, Ms. Thompson had multiple discussions with CCS's Employee Relations Specialist Julie Lindsey regarding the incident and they agreed that termination was the probable outcome, though the decision to terminate plaintiff's employment was not made until the following day, on May 5, 2015, when Ms. Thompson submitted a written Request for Termination.  CCS terminated plaintiff's employment on May 6, 2016.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.     Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a).  A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted).  "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant

points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

### III.    Pregnancy Discrimination Claim

In the pretrial order, plaintiff asserts that defendant terminated her employment on the basis of her pregnancy.  In its motion for summary judgment, defendant, using the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), asserts that plaintiff cannot establish a prima facie case of discrimination and cannot show that defendant's articulated reason for terminating plaintiff's employment is pretextual.  As an initial matter, plaintiff contends that she has come forward with direct evidence of discrimination, thus obviating the need for the *McDonnell Douglas* analysis.  *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (holding that the *McDonnell Douglas* framework does not apply once plaintiff has presented direct evidence of discrimination).  Specifically, plaintiff points to the following evidence as "direct" evidence of discrimination:

> When Ms. Thompson found out that plaintiff was pregnant, she said to plaintiff, "Oh, you're pregnant too?"
>
> A few days later, Ms. Thompson found out that another employee was trying to become pregnant and stated "Are you kidding me?  I don't know what I'm going to do with all these people who are pregnant."
>
> Ms. Thompson, when asked by an administrative assistant about pregnant employees needing time off of work for doctors' appointments, stated "I have too many pregnant workers, I don't know what I am going to do with all of them."

As will be explained, none of the evidence set forth by plaintiff constitutes direct evidence of discrimination.

According to established Tenth Circuit precedent, a "plaintiff proves discrimination by direct evidence when she presents proof of 'an existing policy which itself constitutes discrimination,'" *see Stone v. Autoliv ASP, Inc*., 210 F.3d 1132, 1136-37 (10th Cir. 2000) (citations omitted), or when she presents proof that the employer actually relied on a protected characteristic in making its employment decision (*i.e*., a statement by a decisionmaker during the decisional process showing discriminatory animus), *see Ramsey v. City and County of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)).  As explained by the Tenth Circuit:

> Comments in the workplace that reflect personal bias do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decisionmaking authority and acted on his or her discriminatory beliefs.  We also have explained that discriminatory statements do not qualify as direct evidence if the context or timing of the statements is not closely linked to the adverse decision.  Furthermore, if the content and context of a statement allow it to be plausibly interpreted in two different ways—one discriminatory and the other benign—the statement does not qualify as direct evidence.

*Tabor v. Hilti, Inc*., 703 F.3d 1206, 1216 (10th Cir. 2013) (citations omitted).  Plaintiff's evidence does not reflect an existing policy of discrimination, does not reflect discriminatory statements made by Ms. Thompson during the decisional process and does not reflect that plaintiff's termination was, in fact, based on her pregnancy.  Rather, plaintiff's evidence, without exception, requires the trier of fact to draw an inference that plaintiff's termination was based on her pregnancy in light of purported statements made by Ms. Thompson outside the context of plaintiff's termination.  Only the first comment directly relates to plaintiff and that comment was made more than one month prior to the termination decision.  By definition, then, such evidence is, at best, circumstantial.  *See Didier v. Abbott Laboratories,* 614 Fed. Appx.

366, 372-73 (10th Cir. July 31, 2015); *Stone*, 210 F.3d at 1136-37 (evidence is not direct evidence if it requires a trier of fact to infer discrimination); *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204 (10th Cir. 1999) (statements of personal opinion do not constitute direct evidence of discrimination); *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (workplace comments cannot constitute direct evidence of discrimination if they can plausibly be interpreted in two ways—one discriminatory, one benign).   Moreover, plaintiff fails to direct the court to any cases whatsoever supporting her argument that the evidence regarding Ms. Thompson's comments constitutes direct evidence of discrimination.

For the foregoing reasons, the court will analyze defendant's motion for summary judgment on plaintiff's pregnancy discrimination claims under the *McDonnell Douglas* standard.   Under *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie case of discrimination.   *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012).   To set forth a prima facie case of discrimination, plaintiff must establish "(1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination."   *Id*. (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)).   If she establishes a prima facie case, the burden shifts to defendant to assert a legitimate, nondiscriminatory reason for the adverse employment action. *Id*.   If defendant meets this burden, summary judgment against plaintiff is warranted unless she introduces evidence "that the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id*. (citing *Simmons v. Sykes Enters.*, 647 F.3d 943, 947 (10th Cir. 2011)).

A.      *Plaintiff's Prima Facie Case*

10

In their motion for summary judgment, defendants contend that plaintiff cannot establish a prima facie case of pregnancy discrimination because she cannot show that any similarly situated non-pregnant employees were treated differently and she has no other evidence sufficient to create an inference of discrimination. The Tenth Circuit has repeatedly cautioned that comparison to similarly situated employees is not required as part of a plaintiff's prima facie case and that the relevant prima facie element may be framed more broadly, requiring only a "showing of circumstances giving rise to an inference of discrimination." *See Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005) (collecting cases); *English v. Colo. Dept. of Corrs.*, 248 F.3d 1002, 1008 (10th Cir. 2001) (In disciplinary discharge cases, a "plaintiff does not have to show differential treatment of persons outside the protected class to meet the initial prima facie burden under *McDonnell Douglas*."). To raise an inference of discrimination at the prima facie stage in a discriminatory discharge case, a plaintiff's burden is not onerous—she need only show that she belongs to a protected class; that she was qualified for her job; and that the job was not eliminated after her discharge. *Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1229 (10th Cir. 2000); *Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir. 1999); *see also Nguyen v. Gambro BCT, Inc*., 242 Fed. Appx. 483, 487-89 (10th Cir. 2007) (prima facie step is utilized to eliminate the two most common explanations for termination—lack of qualification or the elimination of the position).

Viewing plaintiff's prima facie burden through the appropriate lens, there is no dispute that she has satisfied her prima facie case. She was pregnant at the time of her discharge; she was qualified for the position; and defendant filled plaintiff's position shortly after plaintiff's charge. This aspect of defendant's motion is denied.

11

B.    *The Pretext Analysis*

Because plaintiff has satisfied her burden of establishing a prima facie case of discrimination, the court turns to whether defendant has met its burden to articulate a legitimate, nondiscriminatory reason for plaintiff's discharge.   "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Carter v. Pathfinder Energy Servs., Inc*., 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).   The Tenth Circuit has characterized this burden as "exceedingly light," and the court finds that defendant has carried it here.  *See id*.  According to defendant, plaintiff was terminated because she took home a note that she received from an inmate in violation of CCS's fraternization policy.   The burden of proof, then, shifts back to plaintiff to show that defendant's proffered reason is pretextual.

Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances."  *Id*. at 1150 (quoting *Kendrick*, 220 F.3d at 1230).   A plaintiff may also show pretext with evidence that the defendant had "shifted rationales" or that it had treated similarly situated employees differently.  *Crowe v. ADT Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011). In essence, a plaintiff shows pretext by presenting evidence of "weakness, implausibility, inconsistency, incoherency, or contradiction in the employer's stated reasons, such that a reasonable jury could find them unconvincing." *Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013).   In

determining whether the proffered reason is pretextual, the court examines "the facts as they appear *to the person making the decision*, not as they appear to the plaintiff." *Id.* (emphasis in original). The court does not "ask whether the employer's proffered reasons were wise, fair or correct" but only whether "the employer honestly believed those reasons and acted in good faith upon those beliefs." *Id.* The court analyzes plaintiff's pretext evidence below.

1. Ms. Thompson's Comments

In an effort to establish pretext, plaintiff first asserts that Ms. Thompson's comments about pregnant employees (outlined above in connection with plaintiff's argument that such comments constitute direct evidence of discrimination) are sufficient to permit a jury to infer that Ms. Thompson terminated plaintiff's employment on the basis of her pregnancy. According to plaintiff, Ms. Thompson's comments suggest that she was frustrated that she had multiple pregnant employees working at the Detention Center and a jury could reasonably infer that Ms. Thompson used the note incident as an excuse to rid herself of one of those pregnant employees. The court disagrees and concludes that these comments are insufficient to establish pretext or to show a discriminatory animus on the part of Ms. Thompson, particularly in the absence of any evidence casting doubt on the veracity of defendant's asserted reason for terminating plaintiff's employment.

Assuming that Ms. Thompson was frustrated by the number of pregnant employees working at the detention center, no jury could infer from her comments that she terminated plaintiff based on her pregnancy. Ms. Thompson's comments do not reflect a negative attitude toward pregnancy generally and seem to suggest only Ms. Thompson's "obvious self-interest in

13

not having [all] full-time nurses take pregnancy leave at the same time." *See Fjeista v. Zogg Dermatology, PLC,* 488 F.3d 804, 809-10 (8th Cir. 2007) (supervisor's statement to employee that she "better take precautions" to not become pregnant because she did not want "both nurses gone at the same time" was a stray remark, particularly as no other evidence linked the comment to the employment actions). Even plaintiff, in the pretrial order, characterizes Ms. Thompson's comments as "wondering aloud how she was going to manage the medical unit with three employees being pregnant at the same time." Statements reflecting an employer's assessment of how to appropriately schedule employees and cover work shifts are not discriminatory. And the court does not believe that a reasonably jury could infer a discriminatory animus in the absence of some evidence tipping the scales in that direction. As explained in the remainder of this opinion, no such evidence exists here.

Moreover, the uncontroverted evidence demonstrates that the termination decision, while perhaps initiated by Ms. Thompson, was made by Ms. Thompson, Ms. Lindsey and Ms. Rice in collaboration with one another. And although Lt. Col. Fewell was clearly not a decisionmaker, his statements undisputedly had a significant impact on the decision to terminate plaintiff's employment. Because plaintiff attributes no discriminatory animus to Ms. Lindsey, Ms. Rice or Lt. Col. Fewell, Ms. Thompson's comments are insufficient to establish pretext. *See Antonio v. Sygma Network, Inc*., 458 F.3d 1177, 1184 (10th Cir. 2006) (allegedly discriminatory comment made by decisionmaker insufficient to establish pretext where comment was made by only one of four decisionmakers and no animus was attributed to remaining decisionmakers).

2.  Deviation from Mandatory Termination Policy

14

Defendant next maintains that pretext is established by defendant's purported failure to follow its mandatory termination policy requiring the submission of a written narrative from the pertinent manager stating the reason for the termination and prior approval of the termination decision from the Regional Vice President—in this case, Lynn Philpott.  It is true that a failure to follow company policy can support a finding of pretext in some circumstances.  *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1045 (10th Cir. 2011).  But the Tenth Circuit has repeatedly cautioned that an employer's failure to follow its own internal procedures does not automatically give rise to an inference of pretext.  *See Hamilton v. Oklahoma City University*, 563 Fed. Appx. 597, 605 (10th Cir. 2014) (collecting cases).  Rather, there must be some indication that the company's failure "rigged the system" against the plaintiff or that the failure disadvantaged the plaintiff.  *See id.* at 605-06.  As the Circuit has explained:

> Employers often fail to follow written policy manuals for benign (sometimes even very sound) business reasons, and in any event our job isn't to enforce employment manuals but to protect against unlawful discrimination.  For an inference of pretext to arise on the basis of a procedural irregularity, we have held that there must be some evidence that the irregularity "directly and uniquely disadvantaged a minority employee."

*Johnson v. Weld County*, 594 F.3d 1202, 1213 910th Cir. 2010) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 n.20 (10th Cir. 1995) (additional citation omitted).  Plaintiff offers no evidence or argument that the two missteps in the termination process disadvantaged her in any respect.[5]  It is uncontroverted that Ms. Philpott was aware of the circumstances leading to

---

[5] Defendant concedes that Ms. Thompson, instead of submitting her own written narrative of the reason for the termination, submitted plaintiff's written description of the incident.  And while there is evidence that Ms. Thompson obtained verbal approval from Ms. Philpott no later than Monday, May 4, the court assumes for purposes of this discussion that Ms. Philpott's approval was not obtained until a few days after the termination decision.  It is uncontroverted, however,

plaintiff's termination and there is no evidence that she objected to that decision, even assuming her "approval" was not obtained until after the decision was made.   With respect to Ms. Thompson's failure to submit her own written narrative of the reason for the termination decision, plaintiff asserts that she has been disadvantaged because it is more difficult for her—without a clear statement of the reason for the termination provided at the time of the decision—to demonstrate to the jury that defendant's proffered reason has changed over time.   But while Ms. Thompson's failure to provide the written narrative may have disadvantaged plaintiff in the course of this litigation, the key is whether Ms. Thompson failed to submit the narrative for a discriminatory reason or whether her failure disadvantaged plaintiff in connection with the employment decision.   Plaintiff has presented no evidence on that issue.   In sum, the failures identified by plaintiff are not sufficiently irregular to permit an inference of pretext for invidious discrimination.   *See Hinds v. Sprint Management Co*., 523 F.3d 1187, 1198-99 (10th Cir. 2008) (the mere failure of a company's employees to follow their employer's manuals and written directives, without more, does nothing to suggest discrimination as opposed to perhaps, say, laxity on the part of company employees).[6]


3.  Changing Explanations

---

that Ms. Thompson had at least two telephone conversations with Ms. Philpott prior to the termination decision.

[6] Plaintiff also asserts that Ms. Thompson violated the company's suspension policy when she suspended plaintiff without prior approval from human resources.   It is uncontroverted, however, that Ms. Thompson obtained verbal approval from human resources to suspend plaintiff prior to suspending plaintiff's employment.

Plaintiff also contends that defendant's proffered reason has changed over time or that the reason given initially was "intentionally vague" so that defendant could later "pick" whatever reason "ended up matching the evidence."  The Tenth Circuit has recognized that a jury can infer pretext when an employer, at the time of trial, offers a new reason for an adverse employment action that is unsupported by the documentary evidence.  *See Matthews v. Euronet Worldwide, Inc.*, 271 Fed. Appx. 770, 773 (10th Cir. Mar. 28, 2008) (citing *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 813 n.6 (10th Cir. 2000) (citing *Perfetti v. First Nat'l Bank of Chicago*, 950 F.2d 449, 456 (7th Cir. 1991))).  In contrast, a jury may not infer pretext when an employer offers a subsequent elaboration on its reasons for an employment decision.  *See id. at* 774.

In this case, the evidence viewed in the light most favorable to plaintiff does not support an inference that defendant was intentionally vague about the reason for the termination decision or that the reason changed over time.  In support of her argument that defendant's proffered reason at the time of termination was vague, plaintiff references her deposition testimony in which she testified that defendant did not tell plaintiff why it was terminating her employment, other than saying it was "based on the severity of our findings."  Read in context, however, plaintiff's deposition testimony demonstrates that she understood that defendant had terminated her employment based on her failure to follow proper protocol when she received the note from the inmate.  In fact, plaintiff clearly testified that Ms. Thompson advised her, at the time Ms. Thompson issued the final written warning, that plaintiff "had not followed the chain of command" and had taken the note to the facility staff rather than taking the note directly to Ms. Thompson.  And the final written warning itself supports this testimony—it expressly indicates

17

that the discipline was based on plaintiff's failure to report a serious issue to her immediate supervisor and her failure to "follow proper policy and procedure as outlined in the employee handbook and instructed at orientation." The undisputed facts, then, simply do not support the conclusion that defendant gave "intentionally vague" reasons for the termination decision at that time.

The court also rejects plaintiff's contention that defendant has changed its asserted reason for the decision over time. According to plaintiff, defendant initially asserted that it terminated plaintiff's employment based on her failure to follow the chain of command when she reported the note and only later "changed" its story to assert that plaintiff was terminated for taking the note home. Plaintiff refers to that portion of her deposition in which she testified that Ms. Thompson told her at the time of the written warning that she "had not followed the chain of command" and further contends that defendant's position statement to the EEOC focuses only on the chain-of-command issue without mentioning plaintiff's decision to take the note home. The argument is "splitting hairs" and the undisputed facts reveal that defendant has consistently maintained that it terminated plaintiff based on her misconduct concerning the note. But the argument lacks merit in any event. In the same excerpt of her deposition wherein plaintiff testified about the chain-of-command, she acknowledges that Ms. Thompson also told her that the "proper protocol" with respect to the note was "to give the note to the guard when the inmates are back in their cells and then come to let her know." By plaintiff's own admission, then, Ms. Thompson clearly mentioned plaintiff's decision not to give the note to the guard and her failure to immediately report the note to her supervisor. Even if Ms. Thompson did not expressly reprimand plaintiff for "taking the note home," plaintiff's deposition testimony

demonstrates that the reprimand included plaintiff's failure to give the note to a guard immediately and her failure to report the incident immediately to her supervisor. Similarly, defendant's position statement clearly emphasizes that plaintiff's "calculated" decision to "ignore" the note and to not report the note on the day she received it was a violation of the Fraternization Policy. As a separate violation of the Fraternization Policy, the position statement references plaintiff's decision to report the incident to a Sergeant at the facility rather than a member of defendant's management as well as defendant's concerns that plaintiff had shared personal information with the inmate based on the contents of the note. No reasonable jury could conclude that the reasons set forth in the position statement and at the time of plaintiff's termination are substantively different from what defendant now asserts.[7]

In a related vein, plaintiff contends that pretext can be inferred because defendant has been inconsistent in identifying the individual responsible for the termination decision. According to plaintiff, defendant identified Ms. Thompson as the sole decisionmaker in its interrogatory responses (and Ms. Thompson confirmed that fact in her deposition), but Ms. Lindsey testified that she and Ms. Rice made the termination decision and communicated that decision to Ms. Thompson. Plaintiff suggests that defendant is attempting to remove responsibility for the decision from Ms. Thompson in light of her comments about pregnant

---

[7] For the same reason, the court rejects plaintiff's suggestion that defendant's response to an interrogatory is inconsistent with its current position. In its interrogatory responses, defendant asserted that plaintiff was terminated as a result of her "violations of CCS' Fraternization Policy." Plaintiff highlights that this response does not include any reference to taking the note home and suggests that more than one reason exists for plaintiff's termination despite the fact that defendant, at this juncture, is relying on only one reason—plaintiff's decision to take the note home. Defendant consistently asserted that it terminated plaintiff's employment based on the note incident, whether that incident includes one or more specific and separate violations of the Fraternization Policy.

employees.  This argument is not supported by the evidence.  In its interrogatory responses, defendant stated that Ms. Thompson made the decision to terminate plaintiff "after consultation" with Ms. Lindsey and Ms. Rice.  In her deposition, Ms. Thompson testified that she made the recommendation to terminate plaintiff's employment but that the decision was a "group" decision that included Ms. Rice and Ms. Lindsey.  Plaintiff fails to direct the court to any deposition testimony in which Ms. Thompson asserts that she was the sole decisionmaker.  Ms. Rice testified that she could not recall whether Ms. Thompson or Human Resources recommended termination, but that the recommendation likely came "from both sides" because the ultimate decision to terminate is a "collaborative" one.   While Ms. Lindsay undisputedly placed more weight on her role in the process, her testimony clearly indicates that she and Ms. Rice communicated about the termination decision with Ms. Thompson throughout the decision-making process.  Her testimony, then, would not permit a reasonable jury to infer pretext when defendant has consistently indicated that Ms. Thompson, Ms. Lindsey and Ms. Rice were all involved in the decision to terminate plaintiff's employment.  In short, Ms. Lindsey's testimony does not suggest any bad faith or dishonesty on the part of defendant.  *Compare Paup v. Gear Products, Inc.*, 327 Fed. Appx. 100, 112 (10th Cir. June 19, 2009) (inference of pretext where defendant failed to name any decisionmakers responsible for RIF decision and failed to explain why it was unwilling or unable to provide names).[8]

---

[8] Moreover, the fact that Ms. Thompson and defendant have clearly stated their belief that Ms. Thompson was primarily responsible for the termination decision significantly undermines plaintiff's theory that defendant, through Ms. Lindsey's testimony, is attempting to remove or distance Ms. Thompson from the termination decision.

4.  Reliance on Superseded Fraternization Policy

Plaintiff next suggests that the Fraternization Policy relied on by defendant in terminating plaintiff's employment was superseded by a subsequent policy that makes no reference to taking correspondence out of the facility.  According to defendant, plaintiff received a Team Member Manual at the start of her employment and acknowledged in writing that the policies in the manual superseded "all prior policies."  The manual generally describes "fraternization" but does not expressly prohibit taking correspondence out of the facility.  Plaintiff, then, suggests that the general description of "fraternization" in the manual supersedes the highly specific, three-page Fraternization Policy relied on by defendant in connection with plaintiff's termination.

Plaintiff's own deposition testimony reflects that this argument is a non-starter.  The specific Fraternization Policy relied on by defendant was marked as an Exhibit in plaintiff's deposition and plaintiff confirmed that she received a copy of that policy at the time she was hired and that she understood that it was defendant's Fraternization Policy.  She also acknowledged in writing at the time she was hired that she had read and received that specific policy.  In light of this testimony, no reasonable jury could conclude that the policy had been superseded by the Team Member Manual as a "prior" policy.

5.  Totality of Plaintiff's Pretext Evidence

While the court has addressed (and rejected) separately the pieces of circumstantial evidence that plaintiff claims demonstrate a pretextual explanation for her termination, the

21

court's inquiry is not at an end.  The ultimate question on summary judgment for purposes of this case is whether plaintiff has presented sufficient evidence such that there is a genuine issue of material fact concerning whether plaintiff's pregnancy actually motivated defendant's decision to terminate her employment.  This question "cannot be answered by looking at the plaintiff's evidence in a piecemeal manner."  *Voltz v. Coca–Cola Enterprises Inc.*, 2004 WL 100507, at *9 (10th Cir. 2004).  Rather, the court must consider whether plaintiff's evidence, taken as a whole, is sufficient to show pretext.  *Sanders v. Southwestern Bell Telephone, L.P.,* 544 F.3d 1101, 111 (10th Cir. 2008) F.3d 1321, 1331 (10th Cir. 1999) (noting that the court, in pretext analysis, is required to consider circumstantial evidence in its totality).  Ultimately, the court concludes that the facts of this case, even viewed in the aggregate and in the light most favorable to plaintiff, do not give rise to an inference of pretext.  For even considering the totality of plaintiff's evidence, that evidence does not demonstrate that defendant's asserted reason for plaintiff's termination is "so weak, implausible, inconsistent, incoherent, or contradictory as to support a reasonable inference that [defendant] did not act for those reasons."  Metzler v. Federal Home Loan Bank of Topeka, 464 F.3d 1164, 1179 (10th Cir.2006).  Stated another way, plaintiff's evidence is insufficient for a reasonable jury to find that defendant's proffered justification was not the real reason for plaintiff's termination.  Plaintiff, then, has failed to meet her burden of demonstrating pretext and summary judgment in favor of defendant is warranted.

## V.      Retaliation Claim

Title VII makes it unlawful for an employer to retaliate against an employee because he or she has opposed any practice made unlawful by those statutes.   42 U.S.C. § 2000e–3(a). Plaintiff asserts in the pretrial order that defendant terminated her employment in retaliation for reporting sexual harassment in the form of the note she received from the inmate.   The court assesses plaintiff's retaliation claim under the *McDonnell Douglas* framework.   *Daniels v. United Parcel Serv., Inc*., 701 F.3d 620, 638 (10th Cir. 2012).   To state a prima facie case for retaliation, plaintiff "must show (1) [s]he engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action."  *Id*. (quoting *Hinds v. Sprint/United Mgmt. Co*., 523 F.3d 1187, 1202 (10th Cir. 2008)).   If plaintiff presents a prima facie case of retaliation, then defendant must respond with a legitimate, nonretaliatory reason for the challenged action.   *Debord v. Mercy Health Sys. of Kansas, Inc*., 737 F.3d 642, 656 (10th Cir. 2013).   Plaintiff, then, must show that defendant's stated reason is pretextual.  *Id*.

In its motion for summary judgment, defendant contends that summary judgment is warranted on plaintiff's retaliation claim because the evidence viewed in the light most favorable to plaintiff demonstrates that she did not engage in protected opposition to discrimination.   Defendant further argues that the record evidence is insufficient to permit a reasonable jury to conclude that defendant's proffered reason for plaintiff's termination is pretextual.   Because no reasonable jury could conclude that plaintiff engaged in protected opposition to discrimination, the court grants summary judgment on plaintiff's Title VII retaliation claim and need not reach defendant's argument concerning pretext.

23

Plaintiff contends that she engaged in protected opposition to discrimination when she reported sexual harassment in the form of the note she received from an inmate. To begin, although defendant does not make the argument, it is not remotely clear from the evidence that plaintiff, in the course of reporting the note, conveyed to defendant a concern "that the employer has engaged in a practice made unlawful" by Title VII. *See Hinds v. Sprint/United Management Co.,* 523 F.3d 1187, 1203 (10th Cir. 2008) ("Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful" by Title VII.). At most, plaintiff's evidence reflects a complaint to her employer that she received a note from an inmate that was "inappropriate" and made her feel uncomfortable. There is simply no suggestion that plaintiff expressed any concern that the note constituted sexual harassment or that defendant, by virtue of plaintiff's receipt of the inmate's note, was engaging in an unlawful employment practice. For this reason, plaintiff's evidence is insufficient to make a prima facie case of retaliation.

Summary judgment is also appropriate because, as defendant contends, plaintiff cannot show that she had a reasonable, good faith belief that she was opposing discrimination prohibited by Title VII. *See Crumpacker v. Kan. Dep't of Human Res.,* 338 F.3d 1163, 1171 (10th Cir. 2003). To make that showing, plaintiff need not establish that she was actually discriminated against; she need only show that she had a reasonable, good faith belief that she was reporting conduct prohibited by Title VII. *Hertz v. Luzenac Am., Inc.,* 370 F.3d 1014, 1015–16 (10th Cir. 2004). To determine whether a reasonable person in plaintiff's position could have believed that she was opposing prohibited conduct, the court looks to the underlying substantive law. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (considering

the elements of a sexual harassment claim in determining whether a plaintiff had a reasonable belief that she had been sexually harassed when she complained to her employer).

Plaintiff contends that it was reasonable for her to believe that she had been subjected to a hostile work environment in violation of Title VII by virtue of the single note delivered to her by an inmate.   An actionable hostile work environment claim requires a showing that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."   *Held v. Ferrellgas, Inc*., 505 Fed. Appx. 687, 691 (10th Cir. Dec. 7, 2012) (quoting *Sandoval v. City of Boulder, Colo*., 388 F.3d 1312, 1326–27 (10th Cir. 2004) (quotation omitted)).   A theme derived from cases addressing the scope of Title VII is that it does not protect from "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."   *Id*. (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).   Applying the underlying substantive law, plaintiff's asserted belief that she was subject to a hostile work environment in violation of Title VII was not objectively reasonable.   Plaintiff asserts that the note was sufficiently severe to alter the conditions of her employment and create an abusive working environment. According to plaintiff, the note constitutes an "unwanted sexual advance" in that the inmate appears to be seeking a sexual relationship with plaintiff.   Plaintiff contends that additional circumstances make the note more intimidating than it might be in other employment settings, particularly the fact that she was working in a jail with male inmates and was thus more vulnerable despite the presence of guards.

The court rejects plaintiff's argument.  Although the Circuit has recognized that a single incident of physically threatening conduct can be sufficient to create a hostile work environment, that single incident must be "extremely" serious or "especially egregious" such as a sexual or physical assault.  *See Macias v. Southwest Cheese Co.*, 624 Fed. Appx. 628, 636 & n.9 (10th Cir. Aug. 24. 2015) (citing cases); *Morris v. City of Colorado Springs*, 666 F.3d 654, 667 (10th Cir. 2012).  Considering the totality of the circumstances, the single incident of alleged harassment in this case was neither extremely serious nor especially egregious.  The inmate never touched plaintiff and never spoke to plaintiff.  While he undisputedly wrote the note to plaintiff, he did not even hand the note directly to her.  Instead, he dropped the note on her medication cart.  And the contents of that note cannot reasonably be construed as threatening or severe.  Finally, while not determinative, the court cannot ignore that plaintiff made the decision to take the note home rather than turn it into a guard and then made the decision to read the note.  Thus, she was in the privacy of her own home (as opposed to the workplace) at the time she was subjected to the contents of the note, which certainly lessens the severity of the conduct.

Because plaintiff has not come forward with sufficient evidence from which a reasonable jury could conclude that she engaged in protected opposition to discrimination, the court grants summary judgment in favor of defendant on plaintiff's Title VII retaliation claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 49) is granted.

**IT IS SO ORDERED.**


Dated this 9th day of February, 2017, at Kansas City, Kansas.


                                             s/ John W. Lungstrum
                                             John W. Lungstrum
                                             United States District Judge